FILED

JAN - 3 2008

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

JOHN MARKEY,

         Plaintiff,

   vs.

KUDELSKI S.A., et. al. ,

         Defendants.

CASE NO. 06-CV- 1300 W (RBB)

ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. Nos. 57, 64); (2) DENYING PLAINTIFF'S MOTION TO MODIFY THE SCHEDULING ORDER (Doc. No. 71); (3) DENYING PLAINTIFF'S EX PARTE MOTION TO SHORTEN TIME (Doc. No. 72.)

   On July 11, 2006 Plaintiff John Markey ("Plaintiff") commenced this action against Defendants Kudelski S.A., Nagravision S.A., and Nagra USA, Inc. alleging breach of contract, wrongful termination and adverse action, and employment discrimination. (Doc. No. 1.)  Pending before the Court is Defendant Nagravision's and Defendant Nagra USA, Inc.'s (collectively, "Defendants") Motion for Summary Judgment, or in the alternative, Partial Summary Judgment. (Doc. Nos. 57, 64.) The Court decides the matter on the papers submitted and without oral argument pursuant to S.D. Cal. Civ. R. 7.1(d.1).  For the reasons stated below, the Court **GRANTS** Defendants' summary judgment motion in its entirety. (Doc. Nos. 57, 64.)

06cv1300W

1   I.     BACKGROUND

2          A.     Introduction

3          Plaintiff John Markey is a United States citizen, fifty-one years old. (*Evan Dwin*

4   *Decl. Ex. A* 31:2-3; 72:4-5 [hereinafter *Markey Dep. Vol. 1*].)  From about 2000 until

5   2004 or early 2005, Plaintiff suffered from rheumatoid arthritis ("RA").  (*Id.* 87:10-24.)

6   Aside from a two-week period when Plaintiff had outpatient foot surgery, Plaintiff's RA

7   did not affect his ability to work or impede his relationships with colleagues or

8   management.  (*Id.* 99:23-100:9; 107:24-108:20.)

9          Defendant Kudelski S.A. ("The Kudelski Group") is a corporation organized and

10  registered under the laws of Switzerland, and Defendant Nagravision S.A. is the Swiss-

11  based Kudelski Group subsidiary that handles software and engineering services to

12  companies that provide television broadcasting services.  (*Saladini Decl.* ¶¶ 3-5; *Opp'n*

13  2.)  Defendant Nagra USA is The Kudelski Group's United States subsidiary which paid

14  Plaintiff his salary and benefits.  (*Id.* ¶ 5.)  Because the claims and acts concerning

15  Nagravision and Nagra USA are nearly identical, the Court will simply refer to both

16  companies as "Defendants" or "Nagravision."

17         Servicios Generales de Telediffusion ("SGT") is a Spanish company that

18  distributes European broadcast equipment.  (*Markey Dep. Vol. 1* 168:10-21.)  QuieroTV

19  ("QTV") is another Spanish company that provides pay television services.  (*Id.* 168:19-

20  24.)  In November 1999, Plaintiff, on behalf of The Kudelski Group, signed a deal with

21  QTV to provide television service in Spain.  (*Id.* 179:9-25.)  Kudelski Group also had

22  a contract with SGT to act as a middleman to provide equipment from SGT to QTV

23  in Spain.  (*Markey Dep. Vol. 2* 209:24-210:12.)  Plaintiff was not involved in the deal

24  between Kudelski Group and SGT.  (*Markey Dep. Vol. 1* 169:12-170:6.)

25

26         B.     Plaintiff is Hired By Nagravision and Takes On Increased

27                Responsibilities

28         On November 11, 1998 Andre Kudelski ("Kudelski"), The Kudelski Group's

1  CEO, hired Plaintiff as the Senior Vice President, Sales and Marketing, of its pay
2  television division. (*Markey Dep. Vol. 1* 117:12-118:16; Ex. C-3.)  The key employment
3  terms included: (1) a $140,000.00 per year salary; (2) that the agreement would be
4  covered by Swiss law; (3) a potential bonus of 100%, but only if Plaintiff reached certain
5  goals (*i.e.* the bonus could be as low as $0 if Plaintiff did not reach 100% of agreed upon
6  goals); and (4) that Plaintiff would spend 50% of his time abroad.  (*Id.* 118:5-16; Exs.
7  C-3, C-5.)  The written contract set forth a term from November 1, 1998 to November
8  1, 1999, and then each year thereafter, but expressly allowed either party to terminate
9  with three months' notice before November 1.  (*Id.*)

10      In January 1999 Kudelski promoted Plaintiff to Senior Vice President for
11  commercial activities, sales, marketing and partnership relationships.  Plaintiff's new
12  responsibilities, which were in addition to his pay TV position, included organizing sales
13  presentations and contract signings around the world.  (*Markey Dep. Vol. 1* 120:25-
14  122:2.)  Plaintiff also had a significant supervisory role.  (*Id.* 123:10-19.)  In August
15  2000, Plaintiff became Chief Marketing Officer.  (*Id.* 122:19-123:9.)    Plaintiff's
16  performance earned him cash and/or stock bonuses in 2000 and 2001, and in January
17  2002 Plaintiff received a raise to $181,000 per year.  (*Id.* 130:6-23; *Evan Dwin Decl. Ex.*
18  *B* 357:9-14 [hereinafter *Markey Dep. Vol. 2*]; Ex. 5.)  At all times Plaintiff continued to
19  report to Andre Kudelski.  (*Markey Dep. Vol. 1* 120:25-121:2; 121:19-122:2.)

20      In Summer 2000 Plaintiff attended a meeting with Kudelski, Nagravision's
21  counsel Patrick Foetisch ("Foetisch"), and two SGT executives.  (*Markey Dep. Vol. 2*
22  200:24-201:10.)  Plaintiff, conducting the meeting on behalf of The Kudelski Group,
23  strongly objected to SGT's attempts to increase the payouts or commissions SGT
24  received in connection with a QTV deal.  (*Id.* 215:22-217:16.)  After recessing with
25  Kudelski and Foetisch, Plaintiff returned to the meeting and told SGT that the
26  payments could not be made.  (*Id.* 222:5-22.)  A heated exchange ensued, Plaintiff felt
27  threatened and left the room, and the meeting continued with Kudelski and Foetisch
28  attempting to placate SGT.  (*Id.* 222:23-224:17.)  Plaintiff did not negotiate any

1  subsequent agreements with SGT or QTV, and thought the SGT payments were illegal.
2  (Id. 209:24-213:18; 203:10-204:5; Markey Dep. Vol. 1 174:12-175:1.)   However,
3  Plaintiff also voluntarily signed off on these payments when preparing an auditing
4  statement.  (Id. 205:21-206:11; 233:10-235:25.)

5      In late 2000 Kudelski placed Plaintiff in charge of a special digital cable project.
6  (Markey Dep. Vol. 1 124:5-125:8; 131:10-132:4.)  Plaintiff's increased supervisory and
7  technical responsibilities caused him to reduce his travel abroad, but not below the 50%
8  as required by his original contract.  (Id. 124:25-126:1; 131:10-14.)   In mid-2002
9  Plaintiff and Kudelski mutually agreed to discontinue the special digital cable project.
10  (Markey Dep. Vol. 1 131:10-132:4; 135:18-23; 142:12-143:19.)

11     In October 2002, Plaintiff and Kudelski met in Switzerland to discuss Plaintiff's
12  future with Nagravision. (Id. 146:1-148:8.)  Plaintiff expressed a desire to become more
13  involved with mergers and acquisitions, and Kudelski agreed in principle to move
14  Plaintiff into a more strategic role. (Id. 148:21-149:8.)  Plaintiff considered this meeting
15  "positive" and states it was clear that, going forward, Plaintiff's primary role was to be
16  strategic, and not sales or marketing.   (Id. 148:9-14.)   After the meeting, Kudelski
17  issued a commendatory press release announcing Plaintiff's new title of "Strategic
18  Advisor." (Markey Dep. Vol. 1 147:6-148:8; Ex. 2.)  Plaintiff's original contract terms
19  (save for the increased salary) remained in effect and Plaintiff continued to report to
20  Andre Kudelski. (Markey Dep. Vol. 1 148:2-8; Ex. 2.)

21     A few days after Plaintiff's meeting, Kudelski asked Plaintiff to head a big project
22  developing a business model to rent technology and collect payment for new
23  Nagravision TV systems (the "rental model").  (Markey Dep. Vol. 1 153:7-155:8.)
24  Plaintiff worked on this project "for a long time" after becoming Strategic Advisor,
25  reporting directly to Kudelski and collaborating with Nagravision's new CFO, Mauro
26  Saladini ("Saladini"). (Markey Dep. Vol. 2 338:25-339:25; Markey Dep. Vol. 1 156:1-19.)
27  ///
28  ///

## C.   Plaintiff's Productivity Decreases, Leading to Termination

By Spring 2003 Plaintiff's work on Nagravision's projects began to diminish. Plaintiff worked reduced hours, ceased traveling to Switzerland, and worked solely from his San Diego home office. (*Markey Dep. Vol. 1* 157:22-158:23; 159:22-25.) Plaintiff's communications with Kudelski ceased entirely, though he contacted Kudelski's secretary about once a month and occasionally consulted with a handful of other Kudelski Group employees. (*Id.* 158:2-23; 160:18-167:22.) From Spring 2003 to February 2004 Plaintiff admits he only worked 20-40 hours per week and did not produce or submit any work product. (*Markey Dep. Vol. 1* 159:11-14; 165:9-19.)

In early 2004, Saladini asked Plaintiff to provide an analysis of Internet television, a potential new market for Nagravision. (*Id.* 159:2-14; *Markey Dep. Vol. 2* 342:23-343:6.) Plaintiff produced a two-page summary based on light internet research and telephone conversations with a few industry colleagues. (*Markey Dep. Vol. 2* 345:21-347:9; *Saladini Decl.* ¶6, Ex. 10.) Around the same time, Saladini requested information on Plaintiff's efforts to develop the rental model. (*Markey Dep. Vol. 2* 340:1-341:8, Ex. 9.) Plaintiff, who (unlike Saladini) was aware that the rental model was already being used, simply forwarded Saladini a spreadsheet prepared by a junior employee. (*Id.* 340:1-341:8.)

In February 2004, Saladini discussed with Kudelski his frustration with Plaintiff's work product. (*Saladini Decl.* ¶ 7.) Given Plaintiff's substantial compensation and low productivity, Saladini and Kudelski determined that it was no longer economically efficient to employ Plaintiff under the current employment agreement. (*Id.*) Because Plaintiff knew the United States market, however, Kudelski and Saladini considered working with Plaintiff on an as-needed basis. (*Id.*)

On May 17, 2004 Saladini contacted Plaintiff, discussed terminating the current employment agreement and proposed an as-needed consulting relationship. (*Id.* ¶ 8; *Markey Dep. Vol. 1* 69:17-17-70:6; 259:23-363:16; 369:24-372:16.) Following the conversation, Saladini emailed Plaintiff a draft Consulting Agreement and Termination

06cv1300W

1  Letter (effective November 1, 2004).  (*Saladini* ¶¶ 8-9.)  Saladini also scheduled a

2  meeting with Plaintiff for June 2, 2004 in Switzerland.  (*Id.*)

3       Plaintiff did not respond to Saladini's email, and did not attend the June 2, 2004

4  meeting.  (*Id.* ¶ 9; *Markey Dep. Vol. 2* 375:14-15.)  On June 4, 2004 Saladini emailed

5  Plaintiff asking why he missed the meeting, and asked Plaintiff to call Saladini's assistant

6  to reschedule.  (*Saladini Decl.* ¶ 9, Ex. 13.)  After again receiving no response of any

7  kind, Saladini requested and Kudelski approved Plaintiff's termination on three months'

8  notice.  (*Saladini Decl.* ¶ 9.)

9       On June 28, 2004 Nagravision provided Plaintiff written notice that his

10  employment was terminated effective November 1, 2004, giving three months notice

11  as required by Plaintiff's employment agreement.  (*Saladini Decl.* ¶ 10, Ex. 14.)

12  Nagravision also asked Plaintiff to attend another meeting in Switzerland scheduled for

13  July 8, 2004.  (*Id.*)  Plaintiff did not attend this meeting.  (*Saladini Decl.* ¶ 11.)  Because

14  Plaintiff's performance had been suffering for quite some time, and Plaintiff had missed

15  two scheduled meetings, Nagravision (on Kudelski's authority) advanced Plaintiff's

16  termination to July 8, 2004.  (*Id.* ¶ 12.)

17

18  **D.    Plaintiff Commences Litigation**

19       On July 11, 2006 Plaintiff commenced this suit against The Kudelski Group,

20  Nagravision, and Nagra USA alleging breach of contract, wrongful termination and

21  adverse action, and employment discrimination.  (Doc. No. 1.)  On April 3, 2007 the

22  Court dismissed The Kudelski Group for lack of personal jurisdiction.  (Doc. No. 28.)

23  Between the remaining litigants, much legal wrangling over discovery followed.

24       On October 30, 2007 Defendants Nagravision and Nagra USA moved for

25  summary judgment, or in the alternative, partial summary judgment.  (Doc. No. 57.)

26  The original hearing date was set for December 3, 2007.  On November 7, 2007

27  Defendants filed an amended notice of motion, which moved the hearing date back to

28  December 17, 2007.  (Doc. No. 64.)  This new hearing date implicitly gave Plaintiff an

1  extra two weeks to prepare his opposition brief.  <u>See</u> S.D. Cal. Civ. R. 7.1(e)(2).

2  On December 3, 2007, the date Plaintiff's opposition was due, Plaintiff filed an

3  *ex parte* application to continue the hearing date an extra week.  (Doc. No. 65.)

4  Plaintiff claimed he needed an extra week to obtain declarations in support of his

5  opposition.  (*Pl.'s* Ex Parte *Mot. to Continue* 2.)  On December 7, 2007 the Court denied

6  Plaintiff's *ex parte* application because Plaintiff did not show good cause to continue the

7  hearing date.  (Doc. No. 69.)

8  On December 10, 2007 Plaintiff finally filed his opposition– a week late per S.D.

9  Cal. Civ. R. 7.1(e)(2), but on time had the Court granted Plaintiff's *ex parte* request.

10  (Doc. No. 70.)  Although the opposition was supported by Plaintiff's deposition and

11  exhibits thereto, it did not contain any new declarations obtained after the opposition's

12  original due date.[1]  That is, Plaintiff did not use the extra week to obtain new

13  declarations, as he stated he would do in his December 3 *ex parte* application.

14  Nevertheless, although untimely, the Court has read and considered the arguments in

15  Plaintiff's opposition.

16  On December 11, 2007 Plaintiff moved to modify the Court's scheduling order

17  so he could amend his Complaint to add new claims for intentional interference with

18  prospective economic advantage, defamation, and unfair competition.  (Doc. No. 71.)

19  The same day, Plaintiff moved *ex parte* to shorten the time in which the motion could

20  be heard.  (Doc. No. 72.)

21  On December 12, 2007 Defendants replied to Plaintiff's opposition.  (Doc. No.

22  73.)  Though technically two days late, Defendants only received Plaintiff's (untimely)

23  opposition on December 10, 2007.  Thus, in fairness the Court accepts Defendants'

24

25  [1]Plaintiff's opposition appears to renew his *ex parte* motion to extend the time to oppose summary judgment so he can obtain declarations to support his motion.  (*Pl.'s Opp'n* 2.)

26  Notwithstanding the technical defects in renewing the motion in his opposition, the Court **DENIES** Plaintiff's request.  The Court denied Plaintiff's first request for an extra week to

27  obtain declarations, finding, *inter alia*, that Plaintiff did not demonstrate the diligence needed to support extending the time to oppose.  (See Doc. No. 69.)  Plaintiff then filed his opposition

28  anyway—seven days later—without the declarations he claimed he needed and would have been able to get, had he more time.  Plaintiff's failure to use the extra week to obtain his declarations further undermines a showing of diligence.

1   reply and will not penalize Defendants for Plaintiff's eleventh-hour obfuscations. Also

2   on December 12, 2007 Defendants opposed Plaintiff's *ex parte* motion to shorten time.

3   (Doc. No. 75.)

4

5   II.   LEGAL STANDARD

6         Summary judgment is appropriate under Rule 56(c) where the moving party

7   demonstrates the absence of a genuine issue of material fact and entitlement to

8   judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

9   U.S. 317, 322 (1986). A fact is material when, under the governing substantive law,

10  it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

11  248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about

12  a material fact is genuine if "the evidence is such that a reasonable jury could return a

13  verdict for the nonmoving party." Anderson, 477 U.S. at 248.

14        A party seeking summary judgment always bears the initial burden of establishing

15  the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving

16  party can satisfy this burden in two ways: (1) by presenting evidence that negates an

17  essential element of the nonmoving party's case; or (2) by demonstrating that the

18  nonmoving party failed to make a showing sufficient to establish an element essential

19  to that party's case on which that party will bear the burden of proof at trial. Id. at 322-

20  23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

21  judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

22  (9th Cir. 1987).

23        "The district court may limit its review to the documents submitted for the

24  purpose of summary judgment and those parts of the record specifically referenced

25  therein." Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1030 (9th Cir.

26  2001). Therefore, the court is not obligated "to scour the record in search of a genuine

27  issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing

28  Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)). If the moving party

1  fails to discharge this initial burden, summary judgment must be denied and the court
2  need not consider the nonmoving party's evidence. <u>Adickes v. S.H. Kress & Co.</u>, 398
3  U.S. 144, 159-60 (1970).

4          If the moving party meets this initial burden, the nonmoving party cannot defeat
5  summary judgment merely by demonstrating "that there is some metaphysical doubt as
6  to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475
7  U.S. 574, 586 (1986); <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th
8  Cir. 1995) (<u>citing Anderson</u>, 477 U.S. at 252) ("The mere existence of a scintilla of
9  evidence in support of the nonmoving party's position is not sufficient."). Rather, the
10 nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the
11 depositions, answers to interrogatories, and admissions on file,' designate 'specific facts
12 showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (<u>quoting</u> Fed.
13 R. Civ. P. 56(e)). However, a court can refuse to find a "genuine issue" where the only
14 evidence presented is uncorroborated and self-serving testimony. <u>Villiarimo v. Aloha</u>
15 <u>Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002).

16         When making this determination, the court must view all inferences drawn from
17 the underlying facts in the light most favorable to the nonmoving party. <u>See</u>
18 <u>Matsushita</u>, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and
19 the drawing of legitimate inferences from the facts are jury functions, not those of a
20 judge, [when] he [or she] is ruling on a motion for summary judgment." <u>Anderson</u>, 477
21 U.S. at 255.

22

23 III.   <span style="font-variant:small-caps">Discussion</span>
24        A.   <u>Plaintiff's Breach of Contract Claim</u>
25        Defendants argue that, under Swiss law, they had valid reasons to accelerate the
26 termination of Plaintiff's contract after initially providing three months notice. (*Defs.'*
27 *Summ. J. Mot.* 15.) Specifically, Plaintiff's low productivity and absenteeism gave
28 Defendants valid reasons to immediately terminate Plaintiff, despite giving the three

06cv1300W

1   months as required by contract. (*Id.* 15-16.) Plaintiff does not dispute his low output,

2   but argues that his absenteeism resulted from Defendants' refusal to cover travel costs.[2]

3   (*Pl.'s Opp'n 9.*)

4          Plaintiff's employment contract is governed by Swiss law.[3] (*Evan Dwin Decl. Ex.*

5   *3.*) Under Article 337 of the Swiss Code of Obligations, an employer "may at any time

6   terminate the employment relationship without notice" if the termination is for "valid

7   reasons." (*Judicial Not. Req. Ex. D.* Art. 337.) Because Article 337 is a "mandatory

8   provision," neither party can contract around it. (*Id.* Art. 361.) Thus, if valid reasons

9   exist, an employer may immediately terminate an employee despite the existence of a

10  notice provision. (*Id.* Art. 337.)

11         Swiss law defines a "valid reason" as "any circumstance under which, if existing,

12  the terminating party can in good faith not be expected to continue the employment

13  relationship." (*Id.*) A judge decides whether circumstances constitute valid reasons.

14  (*Id.*) Other sections of Swiss law frown on absenteeism, giving employers a claim

15  against absent employees and stating that employees must in good faith observe such

16  general directives and specific instructions given to them. (*Id.* Art. 337d; 321d.)

17         For the last two years of his employment, Plaintiff drew a large salary, generated

18  little work product, and admits he only worked 20-40 hours per week. Importantly,

19  Plaintiff also admits that he did not travel to Switzerland or talk to Kudelski, thus not

20  satisfying two express provisions in his employment agreement.

21         Additionally, Plaintiff disregarded two specific instructions to attend meetings in

22  Switzerland to talk about his future role with Nagravision. Although Plaintiff claims

23  _____

24  [2]Plaintiff also analyzes his actions under California law, which is improper. On its face, Plaintiff's employment agreement is covered by Swiss law. Plaintiff's papers do not give the Court any reason to believe that California law should displace what the parties have otherwise

25  bargained for. *See, e.g., Oracle Corp. v. Falotti,* 319 F.3d 1106, 1107-10 (9th Cir. 2003) (applying the Swiss Code of Obligations to employment contract stating that employee's

26  employment would be governed by the laws of Switzerland).

27  [3]The Court takes judicial notice of all applicable provisions of Swiss law provided by Defendants in their Request for Judicial Notice. Because Plaintiffs have not objected to

28  Defendants' request for judicial notice, the Court will cite to the statutes provided in Defendant's Request. (Doc. No. 61; *Judicial Notice Req. Ex. D*).

- 10 -                                    06cv1300W

that Nagravision was at fault for refusing to cover his travel costs, the record only reflects confusion over whether Nagravision would pay for the ticket up front. (*Markey Dep. Vol. 2.*  380:21-382:4.)  Moreover, nothing in Plaintiff's contract guarantees reimbursement or prepayment of travel costs; only moving costs are expressly covered. (*See Evan Dwin Decl., Ex. C-3.*)  Given that Plaintiff was still under contract when Defendants asked him to attend the meetings (at least until November 1, 2004), Plaintiff still had a good faith responsibility to follow specific travel instructions given to him by Nagravision.

It is undisputed that Plaintiff was asked to come to Switzerland twice and disobeyed both directives.  It is undisputed that Plaintiff was no longer fulfilling certain terms of his employment agreement (*e.g.* traveling to Switzerland, talking to Kudelski) or producing significant work product.  Given Plaintiff's high profile position and large salary, Nagravision could not be expected in good faith to continue the employment relationship.  Thus, valid reasons existed to accelerate the termination and ultimately terminate Plaintiff's contract.  Because there are no genuine issues of material fact concerning Plaintiff's termination in regards to his employment contract, the Court **GRANTS** Defendant's summary judgment motion on Plaintiff's breach of contract claim and **DISMISSES** Plaintiff's first cause of action **WITH PREJUDICE.**[4]

///

///

_____

[4]At various times, Plaintiff alludes to Defendants breaching the employment contract for failing to pay certain cash and stock bonuses.  (*Compl.* ¶ 18; *Markey Dep. Vol. 2* 357:9-14 (stock bonus)).  However, Plaintiff's employment agreement clearly states that bonuses would be discretionary, though sets minimums if "100% of the agreed goal is reached." (*Evan Dwin Decl. Ex. C-3.*)  Plaintiff has produced no evidence of what his goals were, how and when he reached them, or otherwise has presented anything suggesting that there is a genuine issue of material fact that he is due bonuses in addition to those already received.

Similarly, Plaintiff contends for the first time in his opposition that he is entitled to unpaid vacation.  (*Pl.'s Opp'n* 10.)  However, Plaintiff has presented no evidence showing that his contract or Swiss law provides for paid vacation or that he is entitled to payment for unused vacation following the end of employment.  Moreover, Plaintiff did not identify this when responding to an interrogatory on damages.  (*Evan Dwin Decl. Ex. B.*)  Thus, no genuine issues of material fact exist as to the issue of paid vacation.  Because Plaintiff presents no evidence that Defendant breached their contract with regards to bonuses or vacation time, the Court affirms the **GRANT** of Defendant's summary judgment on Plaintiff's breach of contract claim.

1      **B.**    <u>Plaintiff's Implied Covenant of Good Faith and Fair Dealing Claim</u>

2         Defendants argue that Plaintiff's claim for breach of the implied covenant of good

3 faith and fair dealing must fail because Swiss law does not imply any such covenant, and

4 Plaintiff's contract must be analyzed under Swiss law. (*Defs.' Summ. J. Mot.* 17.) Even

5 if California law is applied, Defendant contends, the implied covenant cannot be used

6 to secure benefits in addition to those for which the parties contracted. (*Id.*)

7         Plaintiff responds by arguing that the covenant can be violated if an employee's

8 termination is a mere pretext to cheat the employee out of a benefit to which they were

9 already entitled. (*Pl.'s Opp'n* 10.) Because Defendants did not give Plaintiff work, he

10 was unable to earn the discretionary bonus he had been previously paid. (*Id.*)

11         The covenant of good faith and fair dealing exists merely to prevent one

12 contracting party from unfairly frustrating the other party's right to receive *the benefits*

13 *of the agreement actually made*. <u>Guz v. Bechtel Nat'l, Inc.</u>, 8 P.3d 1089, 1110 (Cal. 2000)

14 (emphasis in original).[5] It cannot be used to impose substantive duties or limits beyond

15 those incorporated in the specific terms of an agreement. <u>Id.</u>

16         When an employee is employed at-will, the employer does not breach any implied

17 covenant merely by terminating the employee when it chooses. <u>Id.</u> In other words, the

18 implied covenant, standing alone, cannot be read to impose a "good cause" condition

19 of termination. <u>Id.</u>

20         Plaintiff has presented no evidence suggesting Defendants frustrated Plaintiff's

21 rights to receive any benefits under the original employment agreement. Although

22 Plaintiff argues that Defendants distanced him and provided no work assignments for

23 a year, Plaintiff has produced no evidence that his employment agreement entitled him

24 to some minimum level of guaranteed contact or assigned work. (*Pl.'s Opp'n* 10.) Like

25 his contract claim, Plaintiff has produced nothing describing his "agreed upon goals"

26

27         [5]Defendants argue that, because Swiss law governs Plaintiff's employment agreement, California's implied covenant is wholly unavailable as a remedy. (*Def.'s Summ. J. Mot.* 17.)

28 Although the Court tends to agree, it will be shown that California's implied covenant, as applied to the facts of this case, cannot in any event support a claim for relief.

                   06cv1300W

1  and how Defendants interfered with his ability to earn a bonus (which, at any rate, was

2  discretionary).  Indeed, like <u>Guz</u>, Plaintiff was an "at-will" employee, and thus there can

3  be no independent "good cause" requirement Defendants could possibly breach by

4  exercising their valid discretion to terminate employment.[6]   As discussed above,

5  Defendants had valid reasons (under Swiss law) to accelerate Plaintiff's termination.

6  Because Plaintiff has not produced evidence showing that Defendants frustrated or

7  refused any actually agreed upon right or benefit, the Court **GRANTS** Defendants'

8  summary judgment motion and **DISMISSES** Plaintiff's second claim **WITH**

9  **PREJUDICE**.

10

11      C.   <u>State and Federal Discrimination Claims</u>

12          Defendants argue that under <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792

13  (1973) they, as employers, have articulated legitimate, non-discriminatory reasons for

14  Plaintiff's alleged adverse employment actions.  (*Defs.' Summ. J. Mot.* 18.)  Because

15  Plaintiff cannot show that these reasons are pretextual, Plaintiff's discrimination claims

16  must necessarily fail.  (*Id.* 18-19.)  Plaintiff argues that he has established *prima facie*

17  claims for employment discrimination, and in a conclusory manner argues that, from

18  the record, a jury might be able to find in his favor.  (*Pl.'s Opp'n* 10-11.)

19          The Ninth Circuit analyzes disparate treatment employment discrimination

20  claims under the <u>McDonnell Douglas</u> burden-shifting framework.  <u>McDonnell Douglas</u>,

21  411 U.S. at 792.   If the plaintiff can establish a *prima facie* case, the burden of

22  production shifts to the employer to articulate legitimate, nondiscriminatory reasons for

23  the allegedly adverse employment action.  <u>Id.</u> at 802-05.  Once the employer articulates

24  legitimate, nondiscriminatory reasons, the burden shifts back to the employee, who

25  _____

26  [6]Plaintiff's employment agreement is governed by Swiss law, and the agreement states
    that <u>either</u> party could terminate the agreement on three months' notice. Because the contract
    is devoid of language suggesting that Plaintiff could be terminated only for cause, the Court
27  determines that Plaintiff's employment was most analogous to California's "at will"
    employment.  At any rate, to the extent Plaintiff looks to California's implied covenant to
    supply a remedy, Plaintiff must also be expected to rebut California's presumption that
28  employer's employ employees "at will." <u>See</u> Cal. Lab. Code § 2922.

1  must prove that the legitimate reasons proffered by the employer were simply a pretext

2  for discrimination.  Id.   The McDonnell Douglas test governs each of Plaintiff's

3  national origin, disability and age discrimination claims.  See Coghlan v. Am. Seafoods

4  Co. LLC, 413 F.3d 1090, 1093-94 (9th Cir. 2005) (applying test to national origin

5  discrimination claim); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141

6  (2000) (applying test to ADEA disability claim); Diaz v. Fed. Express. Corp., 373 F.

7  Supp. 2d 1034,1062-63 (C.D. Cal. 2005) (applying test to California's Fair Employment

8  and Housing Act ("FEHA") disability claim); Schultz v. Spraylate Cor., 866 F. Supp.

9  1535, 1539 (C.D. Cal. 1994) (applying test to FEHA age discrimination claim).

10

11        1.    *Nagravision Has Articulated Legitimate, Nondiscriminatory*

12              *Reasons For Plaintiff's Alleged Adverse Actions*

13

14        a.    **Plaintiff's Appointment To Strategic Advisor Was Not An**

15              **Adverse Action**

16  Plaintiff seems to complain of two adverse actions: (1) his appointment to

17  Strategic Advisor in 2002, and (2) his termination in 2004.  (*Compl.* 11, 13.)  As a

18  threshold issue, the Court determines that Plaintiff's appointment to Strategic Advisor

19  was not an adverse action and is thus not actionable.

20        An adverse action is an action that materially affects the terms, conditions or

21  privileges of employment.  McRae v. Dep't of Corr. and Rehab, 48 Cal. Rptr. 3d 313,

22  319 (Cal. Ct. App. 2006).  A transfer into a new position is not an adverse action where

23  it is comparable to the old position and does not result in substantial and tangible harm.

24  Id. at 324-25.

25        Although Plaintiff complains that his career stagnated when he was appointed

26  Strategic Advisor (*Compl.* ¶ 11), his own testimony paints a different picture.  It is

27  undisputed that Plaintiff desired a more strategic role, asked for and was excited about

28  his new position, and even today considers the move a promotion.  (*Markey Dep. Vol.*

1  *1* 146:1-148:8, 148:21-149:22; 109:15-110:4.)   Nagravision's press release spoke

2  glowingly of Plaintiff's talents, and Plaintiff retained his high salary.  Trying to re-

3  characterize Plaintiff's promotion as an "adverse employment action" is simply not

4  believable and contradicts Plaintiff's own testimony.  Thus, any adverse action claims

5  must be premised solely on Plaintiff's termination, and not his promotion to Strategic

6  Advisor.

7

8           b.      **Defendant Has Articulated Legitimate, Nondiscriminatory**

9                   **Reasons for Plaintiff's Termination**

10         Defendants argue that they have presented several legitimate, nondiscriminatory

11  reasons for terminating Plaintiff's employment.  (*Defs.' Summ. J. Mot.* 21.)  Plaintiff does

12  not refute the facts underpinning Defendants' reasons, and merely recites his burden

13  to establish a *prima facie* case.  (*Pl.'s Opp'n* 10-11.)

14         Legitimate reasons for Nagravision's decision to terminate Plaintiff need only be

15  nondiscriminatory and honestly believed.  See Villiarimo 281 F.3d at 1063 (explaining

16  that courts only require than an employer honestly believe its reason for its actions,

17  even if the reasons are foolish, trivial, or even baseless).

18         Defendants have established evidence, much of it by Plaintiff's own testimony,

19  articulating legitimate, nondiscriminatory reasons for Plaintiff's July 8, 2004

20  termination, including: (1) the lack of any substantial work product generated by

21  Plaintiff's own hand between Spring 2003 and February 2004 (*Markey Dep. Vol. 1*

22  159:11-14; *Markey Dep. Vol. 2* 345:21-347:9; *Saladini Decl.* ¶¶ 6-7, 13, Ex. 10.); (2)

23  Plaintiff skipping two scheduled meetings in Switzerland (*Markey Dep. Vol. 1* 69:20-

24  70:6; *Markey Dep. Vol. 2* 359:23-363:16, 369:24-372:16, 375:14-15, 379:18-23, 380:24-

25  382:3, Ex. 15; *Saladini Decl.* ¶¶ 8-12, Exs. 12-14.); and (3) Nagravision's determination

26  that Plaintiff was no longer an asset to the company at his current salary.  (*Saladini* ¶¶

27  6-12, Exs. 12-14.)  Plaintiff has no evidence suggesting that these reasons are not true

28  or not honestly believed.  Because Nagravision has articulated and supported several

1  legitimate reasons for Plaintiff's termination, under <u>McDonnell Douglas</u> the burden

2  shifts back to Plaintiff to prove that these reasons are merely pretextual.

3

4          **2.    *Plaintiff Has Presented No Admissible Evidence of Pretext***

5          When an employer has provided legitimate, nondiscriminatory reasons for an

6  alleged adverse action, the plaintiff must show that the articulated reason is pretextual

7  either directly by persuading the court that a discriminatory reason more likely

8  motivated the employer or indirectly by showing that the employer's preferred

9  explanation is unworthy of credence. <u>Villiarimo</u>, 281 F.3d at 1062. Because Plaintiff's

10 discrimination claims rest on several classifications, including national origin, age, and

11 disability, the Court will take each protected class claim in turn.

12

13          **a.    Plaintiff's National Origin Discrimination Claims**

14         Defendants contend that Plaintiff's national origin discrimination claims are

15 based on nothing more than a few "stray remarks" unrelated to his termination.[7] (*Defs.'*

16 *Summ. J. Mot.* 23-25.)   Plaintiff generally alleges that he has evidenced numerous

17 comments showing animosity toward him based on his national origin which are

18 sufficient for a jury to find in his favor.  (*Pl.'s Opp'n* 11.)  Plaintiff also claims that

19 Nagravision's reasons for dismissal are pretextual because Plaintiff was never told that

20 his job performance was unsatisfactory.[8]  (*Id.*)

21         Stray remarks are insufficient to establish discrimination. <u>Merrick v. Farmers Ins.</u>

22 <u>Group</u>, 892 F.2d 1434, 1438 (9th Cir. 1990).  Stray remarks are remarks unrelated to

23

24         [7]Plaintiff has two discrimination claims based on national origin, one under California's
   FEHA and one under Federal law's Title VII.  (*Compl.* ¶¶ 34-49.)  Because both claims are
25 litigated under the <u>McDonnell Douglas</u> framework, this discussion applies equally to both
   claims.  <u>See</u> <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1219 (9th Cir. 1998) (holding that
26 California law under the FEHA mirrors federal law under Title VII).

27         [8]Plaintiff also r ecites his *prima f acie* burden needed to satisfy the first phase of
   <u>McDonnell Douglas</u>.  (*Pl.'s Opp'n* 11.)  Plaintiff fails to recognize that, because Defendant has
28 provided legitimate, nondiscriminatory reasons for dismissal, establishing a *prima facie* case does
   little at this stage of the litigation. Rather, Plaintiff's burden is to show pretext.

1    the decisional process, and are insufficient to demonstrate that the employer relied on

2    illegitimate criteria. Smith v. Firestone Tire and Rubber Co., 875 F.2d 1325, 1330 (7th

3    Cir. 1989), cited in Merrick, 892 F.2d at 1238.

4            Plaintiff's only evidence of national origin discrimination is his own,

5    uncorroborated testimony that two Nagravision executives occasionally referred to him

6    as an "ugly American" and "not being Swiss." (*Markey Dep. Vol. 1* 53:4-58:24; 59:1-

7    61:1.) However, Plaintiff fails to connect these comments with Nagravision's ultimate

8    decision to terminate him.  Further, these comments were made some time before

9    Nagravision decided to terminate Plaintiff. (*Id.* 59:25-61:1.)  Nor did Plaintiff report

10   to either executive who allegedly made the derogatory comments.  (*Id.* 54:7-13.)

11   Moreover, Plaintiff admits that Kudelski, the decisionmaker whom he reported to and

12   whom had the ultimate authority to hire and fire him, never made any derogatory

13   comments about Plaintiff's national origin. (*Markey Dep. Vol. 1* 23:3-6.)  In short,

14   Plaintiff fails to demonstrate that the purported comments were anything more than

15   stray remarks unrelated to the decision to terminate him. See Merrick, 892 F.2d at

16   1238; Smith, 875 F.2d at 1330.

17           Although Plaintiff argues that discrimination must have been behind his

18   termination because no one told him that his performance was lacking, Plaintiff

19   provides no evidence that Defendant had an affirmative duty to counsel him. Because

20   Plaintiff has failed to produce evidence of pretext on his national origin discrimination

21   claims, the Court **GRANTS** Defendants' motion and **DISMISSES** Plaintiff's fifth and

22   sixth causes of action **WITH PREJUDICE**.

23

24                   b.      **Plaintiff's Disability Claim**

25           Defendants argue that Plaintiff has presented no evidence suggesting that his

26   rheumatoid arthritis had anything to do with his termination. (*Defs.' Summ. J. Mot.* 25-

27   26.)  Plaintiff, however, claims that Nagravision admitted to Plaintiff that his RA was

28   a factor in his termination. (*Pl.'s Opp'n* 11.)  Plaintiff brings his disability claim under

1    FEHA, and not Title VII or the ADA. (*Compl.* ¶¶ 51-57.)

2        In order to establish a *prima facie* FEHA discrimination claim, a plaintiff must

3    show: (1) he suffered from a disability; (2) he was otherwise qualified to do his job; and

4    (3) he was subjected to adverse employment action because of his disability. Diaz, 373

5    F. Supp. 2d at 1063 (citing Finegan v. County of L.A., 109 Cal. Rptr. 2d 762, 767 (Cal.

6    Ct. App. 2001). Because FEHA is modeled after federal antidiscrimination laws,

7    decisions interpreting the federal statutes are relevant when interpreting similar

8    provisions of FEHA. Finegan, 109 Cal. Rptr. 2d at 767. Being aware of plaintiff's

9    disability, or simply thinking about it in discriminatory terms, is not enough to establish

10   a claim. Foster v. Arthur Anderson, LLP, 168 F.3d 1029, 1033 (7th Cir. 1999).

11       Plaintiff has presented no evidence, besides his uncorroborated and self-serving

12   testimony, which suggests that his disability had any effect on the decision to terminate

13   him. Plaintiff even admits that Kudelski, the person with the authority to hire and fire

14   him, sympathized with Plaintiff's RA and wished him well. (*Markey Dep. Vol. 1* 93:13-

15   23.) Although Plaintiff claims that Saladini told him that some "unidentified people"

16   were concerned about his RA, nothing connects these vague apprehensions with

17   Kudelski's termination decision. See Head v. Glacier Northwest, Inc., 413 F.3d 1053,

18   1065 (9th Cir. 2005) (holding that disability must be a motivating factor in the decision

19   making process and have a determinative influence on the outcome). Because there

20   are no genuine issues of material fact regarding Plaintiff's RA and the decision to

21   terminate him, or that Defendant's reasons for terminating Plaintiff were merely a

22   pretext for disability discrimination, the Court **GRANTS** Defendants' motion and

23   **DISMISSES** Plaintiff's seventh cause of action **WITH PREJUDICE.**

24

25           **c.**    **Plaintiff's Age Discrimination Claims**

26       Defendants argue that Plaintiff has presented no admissible evidence which

27   suggests that Plaintiff's termination had anything to do with age. (*Defs.' Summ. J. Mot.*

28   26-27.) Plaintiff has not opposed Defendants' arguments against his age discrimination

1    claims.

2          To establish an age discrimination claim, plaintiffs must show that their age

3    actually played a role in the employer's decision making process and had a

4    determinative influence on the outcome.  Reeves, 530 U.S. at 141.  To the extent

5    plaintiff relies on the age of his replacements, he must show that the replacements were

6    "substantially younger" than Plaintiff.  O'Connor v. Consolidated Coin Caterers Corp.,

7    517 U.S. 308, 312 (1996).

8          Plaintiff admits that no person at Nagravision, including Kudelski, ever

9    commented on his age or how his age might have affected his performance.  (Markey

10   Dep. Vol. 1 71:13-72:3, 76:24-77:4, 77:25-78:8, 78:18-23, 79:22-80:2, 80:21-81:1,

11   81:16-23.)   Moreover, Plaintiff presents no evidence that he was replaced by a

12   substantially younger person after he was terminated (or if he was replaced at all).

13   Because Plaintiff presents no evidence suggesting that his age played any role in the

14   decision to terminate him, or that Defendants' reasons for terminating him were merely

15   a pretext for age discrimination, the Court **GRANTS** Defendants' moti on and

16   **DISMISSES** Plaintiff's eighth and ninth causes of action **WITH PREJUDICE.**

17

18         D.    <u>Plaintiff's Wrongful Termination in Violation of Public Policy Claim</u>

19         Defendants argue that Plaintiff's termination did not violate public policy because

20   Plaintiff has not shown a public policy which was implicated by his termination.  (Defs.'

21   Summ. J. Mot. 27-30.)   Defendants also argue that Plaintiff cannot connect his

22   termination with any alleged public policy violation because Plaintiff was never asked

23   to do anything illegal.  (Id. 31.)   Plaintiff argues, in a conclusory fashion, that he has

24   abundant evidence that he refused to take part in illegal payments to SGT, and was

25   demoted and terminated because of his reluctance.  (Pl.'s Opp'n 7.)   Plaintiff fails to

26   confront or distinguish most of Defendants' arguments, including whether California

27   and/or Federal law applies to events that occurred in Switzerland and whether Plaintiff

28   has actually alleged that what he was asked to perform was actually illegal.

- 19 -

1       The elements of a wrongful termination in violation of public policy claim are:

2 (1) an employer-employee relationship; (2) termination or other adverse employment

3 action; (3) the termination of plaintiff's employment was in violation of public policy;

4 (4) the termination was a legal cause of plaintiff's damages, and (5) the nature and

5 extent of Plaintiff's damage. Holmes v. General Dynamics Corp., 22 Cal. Rptr. 2d 172

6 (1993). When public policy is used to justify a rule of tort liability, the decision must

7 be carefully tethered to fundamental policies that are delineated in constitutional or

8 statutory provisions. Priebe v. Nelson, 140 P.3d. 848, 866 (Cal. 2006).

9       In this case, Plaintiff's Complaint premises his wrongful termination in violation

10 of public policy claim on a California commercial bribery statute (Cal. Pen. Code

11 § 641.3 [hereinafter "Section 641.3"]) and federal law (18 U.S.C. §§ 1341, 1343

12 [hereinafter "Mail Fraud statutes"]). (Compl. ¶ 25.) However, Plaintiff's Opposition

13 seems to shift the public policy premise to FEHA and unidentified Swiss law. (Pl.'s

14 Opp'n 6-7, fn. 2.) This is improper; Plaintiff is expected to support his Complaint's

15 allegations. See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir.

16 2004) (holding that a plaintiff may not amend her complaint through argument in a

17 brief opposing summary judgment).

18       Plaintiff has presented no evidence which suggests Defendants violated public

19 policy by terminating Plaintiff. Plaintiffs have not argued or established evidence of

20 how Section 641.3 or the Mail Fraud statutes represent carefully delineated,

21 fundamental public policies, and are not simply punishments. Compare Hunter v. Up-

22 Right, Inc., 864 P.2d 88, 94-95 (Cal. 1993) (holding that *civil* claims of fraud or deceit

23 are essentially private disputes seeking monetary remedies, and not actions to vindicate

24 broader public interests) (emphasis added). Moreover, even assuming Section 641.3

25 or the Mail Fraud statutes applied, Plaintiff does not present specific evidence on how

26

27

28

06cv1300W

1  Defendant violated the statutes or policies contained therein.[9] His vague, second-hand,

2  and self-serving testimony does not create a genuine issue of material fact.  Nor does

3  Plaintiff, who alleges that the illegal activity took place in 2000 and that his termination

4  occurred in 2004, show the required nexus between the public policy conduct and his

5  adverse action.  See Turner v. Anheuser Busch, Inc., 876 P.2d 1022, 1034 (Cal. 1994)

6  (holding that plaintiff failed to demonstrate nexus between public policy conduct and

7  termination where four years had passed and plaintiff was generally well-regarded during

8  that span).

9       Because Plaintiff has failed to support his termination in violation of public policy

10  claim with facts or law sufficient to create a genuine issue of material fact of whether

11  a policy actually applies or how it was violated, the Court **GRANTS** Defendants'

12  motion and **DISMISSES** Plaintiff's third cause of action **WITH PREJUDICE**.

13  Because, as discussed above, Plaintiff's appointment to strategic advisor was not an

14  adverse action, the Court **GRANTS** Defendants' motion and **DISMISSES** Plaintiff's

15

---

16  [9]Defendants also argue that, because Section 641.3 and the Mail Fraud statutes do not

17  have language making them applicable extraterritorially, no derivative public policy claims premised entirely on extraterritorial acts which may have violated these laws can survive,

18  either.  The Court is inclined to agree.  California courts have long held that "a court should not ordinarily construe a statute as regulating occurrences outside the state unless a contrary

19  intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute."  Speyer v. Avis Rent-a-Car Sys., 415 F. Supp. 2d 1090, 1096 (S.D. Cal. 2005) (citing

20  J.P. Morgan & Co., Inc. v. Superior Court, 6 Cal. Rptr. 3d 214 (Cal. Ct. App. 2003).  Under federal law, congressional statutes are only meant to apply within the territorial jurisdiction of

21  the United States, unless a contrary intent appears.  Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949).  Broad references to "foreign commerce" do not overcome the presumption against

22  extraterritorial effect.  See N.Y. Central R. Co. v. Chisholm, 268 U.S. 29, 30-31 (1925) (holding that although the Federal Employers' Liability Act alluded to "foreign commerce,"

23  nothing definitely disclosed an intention to give the statute extraterritorial effect); McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 20-22 (1963) (reaching similar conclusion with National Labor Relations Act).

24       Plaintiff alleges that Defendants broke the law by terminating him when Plaintiff refused to take part in Defendants' illegal payments from Switzerland to SGT bank accounts located

25  in Switzerland or Liechenstein.  All of the meetings with SGT or QTV that Plaintiff alleges to have participated in took place in Switzerland or Spain.  (Markey Dep. Vol. 2 196:16-199:25,

26  200:24-201:10, 205:21-206:11, 214:16-215:6, 233:10-235:25, 238:18-239:16.)  The only thing which connects the United States or California to Plaintiff's involvement with Defendants,

27  SGT and QTV is the fact that Plaintiff spent 50% of his time in California, occasionally working from a home office.  Plaintiff has not presented any evidence or arguments that this

28  exposure to United States or California law is sufficient to anchor the extraterritorial acts supporting his termination in violation of public policy claim.

1  fourth cause of action for wrongful adverse action in violation of public policy **WITH**
2  **PREJUDICE.**

3

4  **IV. CONCLUSION**

5      Plaintiff has not produced evidence supporting any of his nine claims showing a
6  genuine issue of material fact to be decided by trial. Accordingly, the Court **GRANTS**
7  Defendants' motion and **DISMISSES** Plaintiff's entire case **WITH PREJUDICE.**
8      Specifically:
9      1.  Defendants' Request for Judicial Notice is **GRANTED.** (Doc. No. 61.)
10     2.  Defendants' Motion for Summary Judgment is **GRANTED** in its entirety.
11         (Doc. Nos. 57, 64.)
12     3.  Plaintiff's Motion to Modify the Scheduling Order is **DENIED AS**
13         **MOOT.** (Doc. No. 71.)
14     4.  Plaintiff's *Ex Parte* Motion to Shorten Time is **DENIED AS MOOT.**
15         (Doc. No. 72.)

16

17

18     **IT IS SO ORDERED.**

19

20  Dated: January 3, 2008

21                                          Hon. **THOMAS J. WHELAN**
22                                          United States District Court
                                            Southern District of California
23

24

25

26

27

28

- 22 -